[Crim. No. 16858. Second Dist., Div. Four. Aug. 21, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
CHARLES HENRY WOODBERRY, Defendant and Appellant.

## Counsel

Richard S. Buckley, Public Defender, Edward B. Olsen, James L. McCormick and Lawrence R. Johnson, Deputy Public Defenders, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Russell Iungerich, Deputy Attorney General, for Plaintiff and Respondent.

## Opinion

**DUNN, J.**—This case was before us on an earlier appeal (*People* v. *Woodberry* (1968) 265 Cal.App.2d 351 [71 Cal.Rptr. 165]) when appellant's conviction of first degree murder was reversed on the basis of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]. A second trial, beginning December 18, 1968, concluded on January 14, 1969, with a jury's verdict again finding appellant guilty of first degree murder. (Pen. Code, §§ 187-189.) He was sentenced to life imprisonment and pursues the present appeal from the judgment.

Appellant, with his codefendants Kenney and Magee, was charged with murdering William Sommerville on July 2, 1965. Appellant pled "not guilty." Three prior felonies were charged against appellant, who admitted two of them and the third was stricken on court order. At the first trial, Magee was granted immunity from further prosecution and the case against him ordered dismissed (Pen. Code, § 1324) provided that he comply with the court's order to testify at that trial. He did testify and was exempted from further prosecution. Kenney did not take the stand at the first trial. He was found "not guilty."

On this appeal the evidence must, of course, be viewed in a light favoring the judgment. Between 1 and 2 o'clock the morning of July 2, 1965, witness Terrell was walking home alone from a poolhall in Long Beach. He lived near Parks' Texaco Service Station, which was located at the corner of Lewis and Pacific Coast Highway in that city. When he was at a point one block south of the intersection, he heard two sounds, like gunshots or an automobile backfire, coming from the north in the vicinity of the station. He looked and saw two men run from the station and disappear into a motel across the street from it. At the time, neither person seemed familiar, though he thought he knew the shorter person from his stature, "the way he was built and height and everything." He believed it was appellant Woodberry, known to him as "Cool Mac."

Later on that day, or the next, Terrell read something in the newspaper and, as a result of what he read, asked appellant if he knew anything about the robbery at the Texaco station. Appellant told him that he had robbed it.

Early the morning of July 2d, several persons, including Long Beach police officers, went to the gas station premises. The victim, William Sommerville, who was then dying, stated he had been shot and robbed; ". . . there was two colored guys done it, one tall and one short." Sommerville said they came from behind the gas station with an empty can and then held him up. The taller one had a very slick, or "processed," hair-do and the shorter one's clothing was described. The officers inspected the premises and discovered conditions verifying the robbery and various details of it related by the victim.

We now turn our attention to appellant's complaints on this appeal. These relate to the testimony of Magee and Kenney, and limitation of his cross-examination of Terrell.

### THE MAGEE TESTIMONY

At the first trial of this case Magee, when called as a witness for the prosecution, testified that he, appellant Woodberry, Kenney and others

had been at a friend's home from 8 p.m. July 1st to 2 a.m. July 2d and then all had driven to Bakersfield. The prosecution claimed surprise[1] at this and was granted leave to offer impeaching evidence. Magee was asked if he had made contrary statements to Officer Vogel on April 7, 1966 (when he had confessed to participating in the crime) and he refused to answer. The officer was then called to recite Magee's confession which thoroughly impeached his in-court testimony. In the earlier appeal we stated (at p. 360): ". . . upon retrial, the People will be entitled to call Magee as a witness; and, if he gives testimony contrary to what he said on April 7, 1966, impeach him without proof of surprise."

At this second trial the prosecution, before putting Magee on the stand, indicated to the court a belief that Magee might refuse to testify. A hearing was held outside the jury's presence and Magee was called as a witness. He stated he would refuse to answer any question, "On the ground of being an incompetent witness, and also on the grounds that you, the D.A., are more or less trying to make me impeach myself." He specifically disclaimed self-incrimination as a ground of refusal. Magee was then in custody, serving a term in state prison for burglary, so that the court's recourse to contempt procedures was not fully availing.

Magee was shown a transcript of testimony he gave at the first trial wherein he had testified that he, Woodberry, Kenney and others were in Bakersfield at the time of the robbery-murder in Long Beach. He ultimately agreed to testify as previously.

The jury was called in and he took the stand. On direct examination by the prosecution, he testified he recalled events the night and morning of July 1-2, 1965 and that he was with appellant, Kenney and others. He was asked if he was any place in the City of Long Beach and denied that he was, or that he was anywhere near Parks' Texaco Service Station on July 1-2, 1965, or in a Buick parked at 2:30 a.m. near 17th and Lewis Streets, or parked near the service station in a Buick with Woodberry and Kenney. Thereafter, he refused to answer any further questions.

The prosecutor asked Magee if, on April 7, 1966, he had made statements to a police officer. He refused to answer. Over objection, he was asked about such statements. These were asked solely for impeachment purposes as the court then instructed the jury, adding that the testimony could not be considered as substantive evidence of the truth of matters related. The prosecutor's questions, each of which was answered, "I refuse to answer it," are

---

[1]The trial occurred before January 1, 1967, the effective date of the new Evidence Code which does away with the necessity to prove "surprise."

quoted in the footnote, omitting preliminary questions.[2] Counsel for appellant conducted but a brief cross-examination.

Following this, the police officer was called to the stand by the People and testified he had a tape recording of his talk with Magee. Before further proceedings, appellant's counsel made another motion for mistrial and the trial court, in denying it, stated:

"I think that the decision of the District Court of Appeal in People versus Woodberry has been followed to the letter . . . . There is already in the records of the previous trial, two versions of Mr. Magee as to what occurred,

---

[2] Q. Then didn't Officer Vogel say: "All right, now in your own words, will you tell us what happened?"

Q. And didn't you say: "Well, on the night of June, July 2, we were, ah, broke more or less and ah, my cousin Charles said, ah, —"
Didn't you say that?

Q. Didn't Officer Vogel interject with this conversation: "Charles, Cool Mac Woodberry?"
Didn't he say that?

Q. Didn't you then say: "True, brought up the subject of maybe robbing someone so, ah, I wasn't exactly all for it, but, ah, I was driving the car, so I just more or less went along with it, I, you know . . ."
Didn't you say that?

Q. Didn't Officer Vogel then ask: "What kind of car were you in?"
And didn't you say: " '56 Buick."

Q. Didn't Officer Vogel then say: "Whose car is that?"
And didn't you answer: "It belongs to a, ah, friend of mine, by the name of Ronald Pritchard. He doesn't know anything about it at all, you know . . ."
Isn't that what was said?

Q. Didn't Officer Vogel then say: "All right, go ahead."
Didn't you say: "But, ah, we drove down to ah, 17th and Lewis on the night and parked and, ah, my cousin Charles Woodberry and, ah, Charles Kenney walked down to the gas station while I stayed at the car and, ah, what took place at the gas station I do not know, but they came back with the gas the first time, then they left again with the gun and, ah . . ."
Didn't you say that?

Q. Didn't Officer Vogel ask: "What kind of gun was that?"
And didn't you say: "A .32 automatic, I believe."

Q. Didn't Officer Vogel then ask: "Where did that gun come from?"
And didn't you say: "I don't actually know."

Q. Didn't Officer Vogel then say: "Go ahead."
And you say: "Well, they, ah, took the gun and the gas can back again but they, they told me what was going to take place more or less they were going to rob 'im, you know, but ah, they didn't want to have to shoot 'im you know, but, ah, they left again and I had the car running, you know . . ."

Q. Didn't Officer Vogel say: "Yeah."
And didn't you continue: "I had the car just waiting for 'em when they came running back, they got in the car and we left."

Q. Didn't Officer Vogel then say: "All right now, you were driving, is that correct?"
And you said: "Yes."

Q. Didn't Officer Vogel then say: "Where did Woodberry get in the car at, where did Kenney get in the car at?"
And you say: "You mean at what place or street?"

one, his confession made to Officer Vogel and the other his testimony in the former trial to the effect that he was not present at the time the offense was committed, that he was enroute to Bakersfield with defendant Woodberry and Charles Kenney. One of them is the truth, apparently, and one is a fabrication."

The tape recording was then played to the jury. In the tape Magee stated all of the facts recited in the questions put to him by the prosecutor. Thereafter, the trial court again admonished the jurors not to consider the evidence "for any purpose other than the impeachment of Mr. Magee with respect to his statement that he was not present at the time of the offense charged in this case . . . . You may not consider it as evidence that Mr. Woodberry was a participant in the crime."

The prior statement of a witness "is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing. . . ." Evidence Code, section 1235. The credibility of a witness may be

Q. Didn't Officer Vogel continue: "Yeah, no, in the car, did they both get in the front seat or did they, ah, one get in the front and one in the back er . . ."?
Q. Didn't Officer Vogel say: "You don't remember who?"
And you answered: "No, sir, I don't remember, but they got in the car and we left and drove up to Los Angeles."
Q. Didn't Officer Vogel then say, "Okay," and you say, "And, ah, ran out of gas"?
Q. Didn't Officer Vogel then interject, "Okay," and you continue: "And we had to push it down on, ah, going down the Long Beach Freeway North, to Imperial, we turned off, we turned on Imperial and we were going down Imperial and we ran out of gas"?
Didn't you say that?
Q. Didn't Officer Vogel say, "Yes," and didn't you continue: "It was late that night we had to push it down to a gas station and got more gas and we drove on again."
Q. Didn't Officer Vogel say: "Alright, (sic) now, when they got into the car, did either one of them say anything to you about the robbery and what happened?"
Q. Didn't you say: "They didn't tell me about shooting the man until we were on the Freeway"?
Q. Didn't Officer Vogel then say: "Alright (sic) tell me in your own words who said what to you about the robbery, how much money they got, how much money you got and who actually told you that they did the shooting"?
Didn't he say that?
Q. Was your answer: "Well, we were in the, ah, car on the way to Los Angeles on the Freeway and I asked them what happened, and so Charles, ah, Woodberry told me that, ah, he had to shoot the man and all they got was about 120 something dollars and told me that we would split it later and so I said okay. So, ah, when we got to Los Angeles, we split it all up and I had about 20, 24, 25 dollars"?
Q. Didn't Officer Vogel then say: "Charles, ah, Woodberry, who I show you here a photograph of, photograph number 129 927, taken in Long Beach on 7-12-65, I show you this photograph and is this the Charles Woodberry who is a cousin of yours?"?
Q. Didn't you answer, "Yes."?
Q. Didn't Officer Vogel continue: "Now, this is the man that told you, while on the Freeway, in Pritchard's car, that he had to shoot the guy?"?
And didn't you answer, "Yes."?

attacked by showing that, on some former occasion, he made statements "inconsistent with any part of his testimony at the hearing." Evidence Code, section 780, subdivision (h). And his credibility is open to attack by any party "including the party calling him." Evidence Code, section 785.

No longer is it necessary for the party calling the witness first to establish his surprise by the witness' testimony in order to impeach him, as required under former section 2049 of the Code of Civil Procedure.

*People* v. *Johnson* (1968) 68 Cal.2d 646 [68 Cal.Rptr. 599, 441 P.2d 111], cert. denied (1969) 393 U.S. 1051 [21 L.Ed.2d 693, 89 S.Ct. 679], held that prior inconsistent statements of a witness are not made ad-

---

Q. Didn't Officer Vogel continue: "Alright (*sic*) now, I show you another photograph taken of the deceased person, it is photograph number 18425, on July 2, 1965, is this the person that was shot and killed by Woodberry?"?
And didn't you answer: "I don't actually know, 'cause I didn't see the man."?
Q. Didn't Officer Vogel continue: "Had you ever, at any time, prior to the robbery, that's before the robbery, seen the person?"?
And didn't you answer: "No, I hadn't."?
Q. Didn't Officer Vogel continue: "This Charles Kenney that you were speaking of, does he live or did he live at 222 Allenhurst Street in Los Angeles?"
And didn't you answer: "I don't know."?
Q. Didn't Officer Vogel continue: "Is he, ah, approximately sixteen (16) or seventeen (17) years of age?"?
And didn't you answer: "Yes."?
Q. Didn't Officer Vogel then say: "What did, ah, he say to you that he, himself, did at the robbery?"?
And didn't you say: "He just told me that, ah, he helped take the money out of the house, cash drawers."?
Q. Didn't Officer Vogel then say: "How, did ah, when they were talking to you about this, how did they say the shooting actually came about?"?
And didn't you answer: "They told me, Charles Woodberry, told me, that ah, the man was, ah, coming up on them when they were leaving and he told the man to stop but the man wouldn't stop so he shot 'em."?
Q. Didn't Officer Vogel then say: "He didn't say that the man actually grabbed the gun or anything else, or tried to grab the gun, but that he just was walking up on them and he turned around and shot him, is that correct?"?
And didn't you say: "I believe so, to the best of my knowledge."?
Q. Didn't Officer Vogel then ask you: "All right, now are you willing to go to court and testify to this?"?
And didn't you say, after some silence: "Ah, will ah, everybody be in court?"?
Q. Didn't Officer Vogel then say: "Everybody will be in court, yes. Is there anything else or any reason why you can think that you shouldn't go to court and testify to this, knowing that you were not there at the time that the actual robbery and murder took place?
"Let me ask you this"?
Didn't you say, "What's that?"?

Q. Didn't Officer Vogel continue: "Why are you now up here at Tracy?"
And didn't you say: "I am up here on a, ah, Violation of Probation"?
Q. Didn't Officer Vogel continue: "Violation of Probation of auto theft?"
And didn't you say: "Burglary and Auto Theft"?
Q. Didn't Officer Vogel say: "Burglary and Auto Theft"?
And didn't you say: "Yes"?

missible in a criminal trial in order to establish the truth thereof, under Evidence Code, section 1235, contrary to the rule established by that statute for civil trials. The *Johnson* court reasoned that an accused would be deprived of his constitutional right to confront witnesses against him if this were permitted. ■ *Johnson* does not, however, rule out the use of such statements for impeachment purposes. *People v. Woodberry, supra,* 265 Cal.App.2d at p. 360. And see: *People v. Jackson* (1970) 3 Cal.App.3d 921 [83 Cal.Rptr. 829].

■ Offered for impeachment, "It is not necessary that there should be contrariety in terms between the testimony given and the asserted impeaching statement. It is only necessary in order to render it admissible that the statement should have a tendency to contradict or disprove the testimony or any inference to be deduced from it." *Hanton v. Pacific Elec. Ry. Co.* (1918) 178 Cal. 616, 619 [174 P. 61]. Stated another way, "In order that a witness' present testimony be subject to impeachment, the prior statement must be clearly inconsistent; 'But *inconsistency in effect* rather than contradiction in express terms is the test.'" *Fibreboard Paper Products Corp. v. East Bay Union of Machinists* (1964) 227 Cal.App.2d 675, 699 [39 Cal.Rptr. 64]. Also see: Witkin, Cal. Evidence (2d ed. 1966) pages 1156-1158, section 1254.[3]

■ We tend to the view, however, that the evidence was not properly admissible for impeachment. Magee's briefly responsive testimony on direct examination by the People did not help the prosecution's case. Neither did proof that he lied when so testifying. ■ Thus, disbelief of a witness does not establish that the contrary is true, only that the witness is not credible. *People v. Harrison* (1969) 1 Cal.App.3d 115, 120 [81 Cal.Rptr. 396]; *Oldenburg v. Sears, Roebuck & Co.* (1957) 152 Cal.App.2d 733, 743 [314 P.2d 33]. ■ Magee's prior statements were helpful to the prosecution only if believed. It is quite evident the prosecutor put Magee on the stand not to impeach him, since that would serve no useful purpose, but in the hope the jury would accept the impeaching evidence for its truth.[4] See: *People v. Coleman* (1969) 71 Cal.2d 1159, 1164-1165 [80 Cal. Rptr. 920, 459 P.2d 248].

[3]Appellant's reliance upon the more restrictive rule of admissibility stated in *People v. Collum* (1898) 122 Cal. 186, 188 [54 P. 589] is misplaced, since such rule was expressly questioned, if not overruled, in *Worley v. Spreckels Bros. Coml. Co.* (1912) 163 Cal. 60, 72 [124 P. 697].

[4]We should not be interpreted as holding that prior inconsistent statements may be used to impeach only when the party calling the witness is unaware of testimony which is forthcoming. We are concerned only with the unusual circumstances of the present case.

We now consider whether the evidence was, in fact, admissible· for its substantive effect, to establish its own truth, under *California* v. *Green,* 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930], an opinion of the United States Supreme Court filed June 23, 1970, just after the present appeal was orally argued. That case overruled the holding of our own Supreme Court in *People* v. *Green* (1969) 70 Cal.2d 654 [75 Cal.Rptr. 782, 451 P.2d 422] and specifically rejected the reasoning of *People* v. *Johnson, supra.* In essence, *Green* holds that the confrontation clause of the United States Constitution is not violated by admitting into evidence earlier statements made by a witness presently on the stand, even though made under circumstances affording to the accused no opportunity to cross-examine at the time the earlier statement was made. ▇ More importantly here, the admissibility of such statements is not constitutionally limited to impeachment but the statements may be considered for their own truth, if permitted under state rules of evidence such as are embodied in our own Evidence Code, section 1235. The rationale of the holding is that the requirements of confrontation are met when the witness is in court and subject to present cross-examination.

▇ Magee was present in court, satisfying one aspect of *California* v. *Green.* However, we are faced with a novel inquiry as to whether he was subject to cross-examination at that time. As stated in *Green* (p. 160 of 399 U.S. [p. 498 of 26 L.Ed.2d]): "The witness who now relates a different story about the events in question must necessarily assume a position as to the truth value of his prior statement, thus giving the jury a chance to observe and evaluate his demeanor as he either disavows or qualifies his earlier statement." Here, Magee, after answering the first few questions, refused to testify at all and would neither admit, deny nor qualify the earlier statements which contradicted his testimony. For that reason, the jury would have little to evaluate in his demeanor, except his recalcitrance. Cross-examination of him was necessarily brief, consisting principally of learning from him that he refused to answer any further questions. It thus can be argued with some force that circumstances posited by *Green* were not met.

We have just held the questions asked of Magee, the testimony of Vogel and the tape recording were improperly permitted and admitted for impeachment purposes. We now consider whether the testimony of Officer Vogel and the tape recorded conversation with Magee should have been admitted against appellant as substantive evidence, under *Green.* As already pointed out, Evidence Code, section 1235 permits use of a prior inconsistent statement for two purposes, *i.e.*: to impeach the credibility of a witness (Evid. Code, § 780) and as substantive evidence. To be admissible for either purpose it first must be inconsistent with the testimony of the

witness. Here, Magee testified he was with appellant at all pertinent times; they were not in Long Beach at the time of the crime; more particularly, they were not at or near Parks' Texaco Service Station in a Buick or at all. Certainly, his discussion with officer Vogel contradicted this, and the wealth of detail fortified the inconsistencies.

There remains, however, the constitutional right of a defendant to be confronted by his accusers and cross-examine them. ■ Magee had answered some questions put by the prosecution on direct examination, at both the first and second trials. At each, he thereafter refused to answer any more questions either on direct or cross-examination. Appellant was deprived of any effective means of testing the earlier story Magee told to Officer Vogel and the jury was denied any effective way of judging his credibility. We conclude, therefore, that the evidence was not admissible for a substantive purpose.

Inasmuch as appellant was deprived of his constitutional right to confront, a matter of constitutional significance, we must ascertain if admission of the evidence was "harmless beyond a reasonable doubt," as required by *Chapman* v. *California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711, 87 S.Ct. 824, 24 A.L.R.3d 1065]. We defer this for the moment.

### The Kenney Testimony

■ Kenney, too, was brought to court from incarceration for another crime. It will be recalled that he did not testify at the first trial. When called by the People at the present trial, he testified to knowing Woodberry and Magee. He had an automobile and many times had had it serviced at Parks' Texaco Service Station in Long Beach. He had been with Magee and Woodberry at all times on July 1st and 2d. Shortly after midnight of July 2d (*i.e.:* early the morning of July 3d) Magee, Woodberry, the witness and others had driven to Bakersfield. He denied that at approximately 2:30 a.m. the morning of July 2, 1965, he and appellant went to the Parks' gasoline station, leaving Magee in the car nearby, and robbed the station, following which appellant shot Sommerville.

He recalled meeting Police Officer Vogel on April 11, 1966, and talking with him, but denied any tape recording was made of such conversation. He was then questioned about the conversation, over defense counsel's objection. The court instructed the jury that prior statements of Kenney were admissible only as bearing upon his credibility and not for the purpose of establishing any guilt of appellant. The prosecutor questioned Kenney about the statement in detail, the witness most frequently replying that he didn't remember making that statement.

Following this, Officer Vogel testified and the tape recording was played with certain parts, not here pertinent, excluded from the playing. Appellant's attorney cross-examined Kennèy only in order to bring out his conviction on September 11, 1967, for felony manslaughter.

The evidence impeaching Kenney was admissible for that purpose. On direct examination, his story was of being constantly with appellant and Magee on July 1, 2 and 3, and of going to Bakersfield with them early in the morning of July 3d. He testified they were not involved in the robbery-murder in Long Beach the morning of July 2d. All of this, if believed, constituted an alibi which would exonerate appellant. The prosecution was within its rights in attempting to secure the jury's disbelief of the story. The details of the robbery-murder, as related by the witness to Officer Vogel, were a part of the impeachment, making it more credible since supported, in part, by the physical facts ascertained by police officers who had investigated at the scene and who testified regarding them. Thus, some of the strength of the impeaching evidence lay in its accurate detail, which could not have been supplied in a purely fabricated tale.

The impeaching evidence was also admissible to establish its own truth and as substantive evidence, under *California* v. *Green, supra*.

### The Terrell Testimony

We now consider the testimony of Terrell. Direct examination of him began and ended early the afternoon of December 31, 1968, with Terrell testifying as indicated earlier in this opinion. Cross-examination consumed the remainder of that afternoon's session. It was resumed on January 2, 1969, taking the whole day. A substantial part of the cross-examination of January 2d consisted of attempts to refresh the witness' memory, or to impeach him, from a transcript of the testimony he gave at the first trial.

After additional cross-examination the morning of January 3d, the witness was temporarily excused at the morning recess. He was called back that afternoon, the jury being excused, to testify to an occurrence he had mentioned at recess to the prosecutor. He testified to being a member of a Negro organization calling themselves "Black Panthers." After leaving court the preceding night, he was returned to the county jail where he was being kept, apparently on security for return to a federal prison where he had six more years to serve on a federal sentence. In this jail he was approached by two members of the organization, who threatened him with physical harm if he gave any more testimony against a "black brother."

For that reason, he said, "I'm not going to testify any more." No other reason was stated and the court concluded his refusal to testify was willful and contumacious.

The afternoon of January 6th, Terrell was returned to court for further cross-examination with the jury present. He refused to answer when asked if he could identify two photographs (defendant's exhibits F and G for identification), or to say if his reading of the transcript of testimony that he gave at the first trial refreshed his memory. He refused to answer any further questions at all, though ordered by the court to do so.

The prosecution offered stipulations permitting defense counsel to read the transcript and to introduce the exhibits, but these offers were declined and appellant moved for a mistrial upon the ground he had no opportunity to complete his cross-examination. The motion was denied, the court noting there had been extensive cross-examination and, additionally, that the prosecution had offered to permit appellant's reading of Terrell's testimony from the first trial for impeachment purposes. (At the first trial, the reporting of his cross-examination, alone, consumed several hundreds of pages.) Terrell was recalled before the jury on January 8, 1969, and again refused to testify. With the court's permission, defense counsel then read for impeachment purposes, only, many pages of testimony Terrell had given at the first trial.

There had been no motion to strike Terrell's entire testimony. A mistrial, only, was requested. We need therefore determine only the propriety of the court's ruling on that motion.

The striking of testimony removes it from consideration; it is to be treated by the jury as never having been heard. They may not consider it, counsel may not refer to it in argument and, if its absence removes some key part of a case, other evidence must supplant it or a situation arises for the making of pertinent motions.

A motion for a mistrial, on the other hand, serves a different purpose. Such motion, when made under the circumstances here present, presupposes the effect of the evidence is so prejudicial as to be incurable by striking it and admonishing the jury to disregard it. In other words, a motion to strike presupposes error of some sort, whereas the motion for mistrial presupposes error plus incurable prejudice. In the first instance, the trial may go on to a conclusion; but in the second instance it is terminated, perhaps to begin anew. We examine the record to ascertain if the trial judge, in denying appellant's motion for mistrial, abused his discretion.[5]

---

[5]In his brief, appellant cites decisions dealing with motions to strike testimony (as: *People* v. *Barthel* (1965) 231 Cal.App.2d 827, 834 [42 Cal.Rptr. 290]) as does respondent. None seems pertinent, since a different motion was made.

The right to cross-examine is given particular importance in criminal trials. Accordingly, an order by the trial court precluding a defendant from any cross-examination of a witness very likely would require a reversal. In our case, appellant did cross-examine Terrell for the better part of two days, so that we deal not with preclusion but with impairment or limitation.

Terrell had faced the defendant, and his demeanor under direct and cross-examination was observable by the jurors.[6] The trial judge was required to determine if Terrell's refusal further to answer appellant's questions so limited appellant's constitutional prerogative as to prejudice him. The case had once previously been tried and the transcript of testimony from that first trial would indicate to the second trial judge what further was likely to unfold. The judge thus could be put in good position to ascertain from a prospective point of view what would be the probable effect upon the jury of Terrell's recalcitrance after cross-examination for two days.

Also, at the time of Terrell's refusal to testify, 10 days of trial had passed. A motion for mistrial, if made in the early stages of a trial, is more likely to be granted since the judge, having heard little of the evidence, cannot then evaluate its prejudicial effect, if any, on the case as a whole. Here, the motion was made only after the trial was well along, permitting the judge to view the situation from retrospective advantage.

The express purpose of appellant's cross-examination was only to impeach, and thus weaken the People's evidence, not to develop evidence supporting a defense; appellant lost nothing substantive. While wide latitude to test the credibility of a witness is desirable (Witkin, Cal. Evidence (2d ed. 1966), pp. 1119-1120, § 1211), such latitude is not limitless and the trial court must exercise a measure of discretion in that respect. Here, appellant had been afforded considerable opportunity to cross-examine Terrell.

We find no abuse of the trial court's discretion in denying appellant's motion for mistrial.[7]

 Appellant makes one further complaint. Defense counsel, while reading to the jury the testimony Terrell gave at the first trial, asked him a

[6] Additionally, appellant's counsel was permitted to advise the jury, under stipulation, that Terrell had been convicted and committed to federal prison for possessing stolen mail, a felony. Terrell was thus impeached.

[7] A helpful analogue appears in *People* v. *Robinson* (1961) 196 Cal.App.2d 384, 390 [16 Cal.Rptr. 484] wherein the court discusses Wigmore's views regarding recalcitrant witnesses in connection with motions to strike testimony.

number of questions. To each of these, Terrell replied that he refused to answer. At the conclusion of cross-examination, the prosecutor, on redirect examination, asked Terrell why he refused to testify, if his refusal was occasioned by threats of physical harm, and if he had, in fact, actually been harmed following the first trial. He refused to answer these questions, also. Thereupon, the district attorney received the court's permission to read to the jury testimony given by the witness at the hearing held the afternoon of January 3, 1969, with the jury absent. Terrell then had testified to the threats received from fellow Black Panthers, when he was returned to jail from court on the evening of January 2d. He also had testified to an incident occurring while testifying at the first trial when, on being returned to jail, appellant, who was then confined in the same cell block, cursed him. After that trial, Terrell had been set upon one night by 12 Black Panthers who told him he had broken his oath never to testify against a "black brother"; they started a fight and cut and bruised him. He had further specifically testified that appellant did not know he was a Black Panther, that appellant knew nothing about the incident and it was not instigated by him. After this evidence was read, defense counsel again moved for a mistrial, which was denied.

The record shows that a stipulation previously had been offered by the prosecutor to defense counsel that he could read Terrell's testimony from the first trial. Defense counsel had declined to accept it, stating he wished to ask Terrell questions before the jury, although knowing he would not answer them. The jurors, on hearing Terrell's refusal to testify, well might erroneously have inferred that his refusal was caused by antagonism toward appellant, by a desire or need to favor the prosecution, or was induced by the People. Appellant, by making the jury aware of Terrell's obstinance, entitled respondent to introduce evidence countering adverse inferences or impressions that might arise from that fact. We find no error in the court's ruling which permitted respondent to read the record of Terrell's explanation for his obdurateness.

## CONCLUSION

The testimony of Kenney and Terrell, together with the other evidence, was more than enough to sustain appellant's conviction. Thus, there exists no doubt that a robbery-murder took place; appellant's participation in it is established with equal firmness. Though Magee's testimony was not admissible, and it was error to admit it, such testimony was, at best, cumulative. We cannot say a jury might have found appellant not guilty, considering the admissible evidence alone, and the error in admitting the

testimony of Magee was, in our view, harmless beyond any reasonable doubt.

The judgment is affirmed.

Jefferson, Acting P. J., and Kingsley, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 15, 1970. Peters, J., was of the opinion that the petition should be granted.