Filed 9/13/21  Ramirez v. Barajas CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| FRANCISCO ROMEO RAMIREZ, | |
| Plaintiff and Appellant, | E071558 |
| v. | (Super.Ct.No. CIVDS1516561) |
| ISAOLE BARAJAS et al., | OPINION |
| Defendants and Appellants. | |

APPEAL from the Superior Court of San Bernardino County. John M. Pacheco, Judge. Affirmed; cross-appeal dismissed.

Wilshire Law Firm and Daniel B. Miller for Plaintiff and Appellant, Francisco Romeo Ramirez.

Kinkle, Rodiger and Spriggs, Scott B. Spriggs, and Ronald R. Carlson for Defendants and Appellants, Isaole Barajas and Star Auto Parts, Inc.

1

Plaintiff Francisco Ramirez appeals from the judgment after a jury trial on his personal injury claim. Plaintiff sued Isaole Barajas and her employer, Star Auto Parts, Inc., (defendants) for $1.4 million in damages after Barajas rear-ended another person's car, causing it to hit the back of his pickup truck. Defendants admitted negligence but contested causation and damages, and two months before trial, plaintiff rejected their settlement offer of $350,000. (Code Civ. Proc., § 998, unlabeled statutory citations refer to this code.) Ultimately, the jury concluded defendants were responsible for some but not all of plaintiff's medical costs (he had shoulder and neck surgery after the accident), awarding him a total of $58,311.77.

Plaintiff challenges the damage award, arguing it is contrary to the law on exacerbating a preexisting condition because the evidence the accident worsened his existing shoulder injury was undisputed. He also argues the trial court committed reversible error by excluding two documents he intended to use to impeach defendants' orthopedic expert. In addition, defendants have filed a cross-appeal of the section 998 award, arguing the trial court improperly taxed the majority of their costs.

We conclude plaintiff's arguments lack merit and defendants' cross-appeal is untimely. We therefore affirm the judgment and dismiss the cross-appeal for lack of jurisdiction.

# I

## FACTS

A.     *The Accident and Subsequent Medical Treatment*

In November 2014, Barajas was on delivery for her employer when she caused a rear-end collision involving three cars. She tried to change lanes but didn't see there was a construction zone ahead and the cars in front of her had stopped. Her subcompact Ford Fiesta rear-ended another subcompact car (a Chevy Aveo) at about 50 miles per hour, which caused that car to collide with plaintiff's pickup truck (a Nissan Frontier) at about 17 miles per hour. Plaintiff had been looking in his rearview mirror and saw the first collision happen so he braced for the impact by putting his foot on the brake and hands on the steering wheel.

After the accident, plaintiff made sure his two sons weren't hurt, then got out of his truck to check on the other two drivers, who were also okay but Barajas was crying and apologizing. Plaintiff told her accidents happen and it was a good thing no one was hurt. When the police arrived, plaintiff declined medical treatment but mentioned he had some pain in his shoulder and neck. He drove away from the accident and took his sons to lunch before going home. The cost of repairing his truck was $772 for parts and $2,507 for labor.

The accident happened on Friday afternoon. Plaintiff said he felt some pain over the weekend and took two ibuprofen. On Sunday, he hired an attorney, who referred him to a chiropractor. The chiropractor diagnosed plaintiff with a cervical spine sprain or

3

strain and treated him for about 20 sessions.[1] The chiropractor's final assessment report, dated January 2015, says plaintiff's neck pain had "resolved with full range of motion." At trial, the chiropractor said the diagnostic test he performed on plaintiff's neck did not indicate radiculopathy (or nerve injury).

In February 2015, plaintiff had surgery on his right shoulder to repair a tear in his labrum (bone socket tissue) commonly referred to as a "SLAP" tear (which stands for "superior labrum anterior to posterior"). In May 2015, he began receiving cervical injections for renewed pain in his neck and, in April 2016, underwent surgical discectomy and fusion of his fifth and sixth cervical vertebrae (C5 and C6).

Plaintiff was 39 years old at the time of the accident and was between jobs. His most recent employment was in 2012, working in construction as a stone setter, a job that required him and his partner to lift 100- to 200-pound stones on a routine basis.

B.      *Expert Testimony*

Both sides presented medical and accident reconstruction experts to express their views on the severity of the accident and whether it necessitated the treatment plaintiff had received. It was undisputed that the Delta-V of plaintiff's truck (the change in speed from the impact) was between seven and eight miles per hour. It was also undisputed that the labral tear in plaintiff's right shoulder was a preexisting condition and was not caused by the accident. As defendants' radiologist explained, the presence of a sizable cyst near

_____

[1] A sprain is an injury to the tissue or tendons that connect two bones together, whereas a strain is an injury to muscle or the tendons that attach muscle to bone.

4

the tear (caused by joint fluid seeping into the injury) meant the tear had occurred a few years before the accident—either from one movement or repetition over time.

Where the experts disagreed was whether the accident necessitated either surgery. Plaintiff's experts believed the accident had exacerbated the tear to the point it required surgery and had caused a disc injury to plaintiff's neck. Plaintiff's radiology expert could not say whether the abnormalities in plaintiff's cervical discs that were present in his postaccident MRI predated the accident. Dr. Alexander, the orthopedic surgeon who had performed the discectomy and fusion of plaintiff's C5 and C6 vertebrae, acknowledged that plaintiff's MRI indicated he was suffering from aging-related disc degeneration, but he believed the accident had caused additional trauma to the discs thereby necessitating surgery.

Defendants' orthopedic expert, Dr. Bhatia, strongly disagreed with Dr. Alexander's opinion and his treatment plan. He said it is virtually impossible in today's vehicles for a person to suffer a spinal injury from a low speed collision, and that if plaintiff *had* suffered a disc injury from the accident, he would have immediately felt severe nerve pain in his neck and the pain would have persisted. He believed the surgery Dr. Alexander performed was "absolutely" unnecessary at this stage of plaintiff's life and that he would have recommended more conservative and less invasive treatment. In his opinion, plaintiff had suffered a cervical sprain from the accident, necessitating precisely the type of treatment the chiropractor had performed. He said the cost of that treatment would typically be $2,000 but could be as high as $4,000.

Defendants' radiologist believed to a medical certainty that plaintiff's MRI showed chronic, aging-related degeneration that was actually quite typical for someone plaintiff's age. He explained that the presence of bone spurs on plaintiff's cervical vertebrae indicated his discs had been degenerating for years prior to the accident. The fact the discs were bulging rather than herniated also pointed towards a chronic condition as opposed to acute trauma.

As for plaintiff's shoulder, Dr. Bhatia apportioned the cause of surgery equally between the accident and the preexisting tear and cyst. He said that "both of the issues . . ., the incident and the underlying labral tear and cyst played into" the need for surgery. "[I]f either one of those hadn't existed, he probably wouldn't have needed surgery at the time he had it." When asked if he could quantify "on a percentage basis . . . what portion [of the shoulder surgery] would be due to preexisting conditions and what portion would be due to the auto accident," Dr. Bhatia replied, "I would say 50/50."

Finally, defendants' accident reconstruction and biomechanics expert concluded it was virtually impossible defendant suffered a disc injury from the accident because the impact was so minor. He explained that a change in velocity of seven to eight miles was within the range of impact between bumper cars, and the trailer hitch on the back of plaintiff's truck had absorbed some of the impact. By his calculation, the impact would have caused plaintiff's neck to move three inches at most, which could possibly result in a muscle or tendon strain, but not radiculopathy or disc injury.

6

## C. *The Verdict*

The parties stipulated that the reasonable charges for the medical treatment plaintiff had received was $205,881.17—that is, $62,623.53 for the shoulder treatment and $143,257.64 for the neck treatment. During plaintiff's closing statement, counsel argued his damages totaled over $1.4 million broken down as follows: $205,881.17 for past medical expenses; $150,000 for future medical expenses; $400,000 for past pain and suffering; and $653,350 for future pain and suffering. In contrast, defense counsel argued for a total damage award of $65,000. He said defendants should be liable for half the cost of the shoulder surgery plus $4,000 for the chiropractic treatment of the neck, plus $30,000 for past pain and suffering.

The jury retired to deliberate around noon on the last day of trial and returned a verdict that same afternoon. They found Barajas' negligence was a substantial factor in causing harm to plaintiff and awarded him $58,311.77 in damages, comprised of $33,311.77 for past medical expenses, $25,000 for past pain and suffering, and nothing for future medical expenses or future pain and suffering. They were unanimous on each of the damage amounts except for the $25,000 award for past pain and suffering, for which the vote was nine to three.

# II

## ANALYSIS

A.      *The Damage Award*

Plaintiff contends the damage award is contrary to the law on aggravation of preexisting conditions. He argues the evidence was undisputed on two crucial points—that the accident had aggravated his labral tear and that he would not have needed surgery if the accident had not occurred. As a result, he argues, the law on aggravating preexisting conditions renders defendants liable for the entire cost of his surgery, not half the cost like the jury awarded. We disagree.

"The amount of damages is a fact question, committed . . . to the discretion of the jury," and we review the award for substantial evidence. (*Westphal v. Wal-Mart Stores, Inc.* (1998) 68 Cal.App.4th 1071, 1078.) We do not "reassess the credibility of witnesses or reweigh the evidence," but instead "consider the evidence in the light most favorable to the judgment, accepting every reasonable inference and resolving all conflicts in its favor." (*Ibid*.) "A reviewing court must uphold an award of damages whenever possible and all presumptions are in favor of the judgment." (*Bertero v. National General Corp.* (1974) 13 Cal.3d 43, 61, citations omitted (*Bertero*).)

A plaintiff in a personal injury action must prove causation of injury to a reasonable medical probability. (*Jones v. Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402.) Here, plaintiff is correct that "'a tortfeasor may be held liable in an action for damages where the effect of his negligence is to aggravate a preexisting

8

condition or disease." (*Sanchez v. Kern Emergency Medical Transportation Corp.* (2017) 8 Cal.App.5th 146, 168.) What he overlooks however, is the second part of the preexisting condition rule, which provides that he may recover only to the "extent that his or her condition has worsened as a result of defendant's tortious act." (*Ibid.*)

The trial court correctly instructed the jury on these principles with CACI 3927, which says that if the jury found plaintiff "had a physical or emotional condition that was made worse by [the accident]," they "must award damages that will reasonably and fairly compensate him *for the effect* on that condition." (Italics added.) The instruction directs the jury to "decide the full amount of money that will reasonably compensate . . . [plaintiff] for all damages *caused by [the accident]*, even if [he] was more susceptible to injury than a normally healthy person would have been, and even if a normally healthy person would not have suffered similar injury." (Italics added.)

While it was undisputed plaintiff's labral tear was a preexisting condition and the accident aggravated it, the evidence was in conflict over whether the accident caused plaintiff *to need surgery*. Plaintiff's experts said the accident was the sole cause of surgery, but when defense counsel asked Dr. Bhatia if the accident was the sole cause or whether he could quantify what portion of the shoulder surgery was caused by the preexisting conditions and what was caused by the accident, Dr. Bhatia replied that both were causes and the allocation was "50/50." He then reiterated the point on cross, explaining, "both of the issues that we've discussed, the incident and the underlying

9

labral tear and cyst played into it. He—if either one of those hadn't existed, he probably wouldn't have needed surgery at the time he had it."

At oral argument, plaintiff argued Dr. Bhatia's opinion was based on mere possibility, and not on a reasonable medical probability, because the expert used the word "maybe" in the following sentence: "So maybe if he didn't have the car accident, he [would wind] up needing the surgery at the same time." But this takes too narrow a view of Dr. Bhatia's opinion. It ignores the fact he also told the jury that "both . . . the incident and the underlying labral tear and cyst played into it" and "if either one of those hadn't existed, he *probably* wouldn't have needed surgery at the time he had it." (Italics added.) Plaintiff is correct that the standard for establishing causation in a personal injury case is not "medical 'possibility.'" (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1118.) But neither is it medical certainty. The standard is "medical 'probability,'" and a "possible" cause "becomes 'probable' when, in the absence of other reasonable causal explanations, *it becomes more likely than not that the injury was a result of its action.*" (*Ibid.*) As we read the entirety of Dr. Bhatia's testimony, he provided the jury a basis to conclude it was more likely than not that the accident and preexisting conditions were equal causes of his harm (i.e., the cost of shoulder surgery).

The adequacy of damages depends upon the facts of each case. (*Miller v. San Diego Gas & Electric Co.* (1963) 212 Cal.App.2d 555, 558.) "Obviously there is no rule by which either expert or laymen may measure the precise degree, if any, to which a pre-

10

existing pathological condition has been aggravated." (*Taylor v. Pole* (1940) 16 Cal.2d 668, 672-673.) As a result, "the segregation of the items which combine to form the full measure of actual injury is a matter for the exercise by the jury . . . and in assessing the damages it is accorded a 'wide latitude' and an 'elastic discretion.'" (*Ibid.*)

It is clear from the damage award that the jury found Dr. Bhatia's opinions more credible than those of plaintiff's experts. Dr. Bhatia allocated 50 percent of the need for surgery to the accident and testified that $2,000 was a reasonable cost for chiropractic treatment of a cervical sprain/strain. The jury awarded $33,311.77 for past medical expenses, which equals the sum of half of the stipulated cost of the shoulder surgery plus $2,000 for chiropractic treatment.

"The relevant and considered opinion of one physician, though inconsistent with other medical opinions, may constitute substantial evidence." (*Smith v. Workmen's Comp. App. Bd.* (1969) 71 Cal.2d 588, 592.) Because the damage award is sufficiently supported by Dr. Bhatia's testimony, we presume the jurors resolved the evidentiary conflicts in defendants' favor and defer to their determination of the effect the accident had on plaintiff's preexisting condition. (*Bertero*, *supra*, 13 Cal.3d at p. 61.)

B.    *Excluded Impeachment Evidence*

Plaintiff argues that two of the trial court's rulings limiting his counsel's attempt to impeach Dr. Bhatia constitute reversible error. Again, we disagree.

11

## 1. *Additional facts*

Dr. Bhatia is the chief of spine surgery and chair of the orthopedics department at the University of California, Irvine (UCI). He is a board-certified specialist in spine surgery, graduated valedictorian of his class at Baylor College of Medicine, and has written more than a dozen text books or book chapters in his field. He has received awards and recognition for his research and surgeries, the most notable of which was when he operated on an "internal decapitation." The patient's skull had been severed from his spine (and was held together by only the skin and muscles) during a car accident that left the driver dead. Dr. Bhatia fully repaired the injury, "[a]nd six weeks later he was throwing the ball out at the first Angels game."

On cross-examination, plaintiff's counsel attempted to impeach Dr. Bhatia's credibility in two areas. First, counsel tried to admit as a prior inconsistent statement the following quote from an informational pamphlet: "Each year, about three million people experience whiplash injuries to their neck and back. Of these three million people, only about one half, will fully recover. About 600,000 of those individuals will have long-term symptoms, and 150,000 will actually become disabled as a result of the injury." The pamphlet was called "A Patient's Guide to Cervical Whiplash," and it had Dr. Bhatia's name, telephone number, and photograph on it. Before introducing the pamphlet, plaintiff's counsel asked Dr. Bhatia if he "[w]ould . . . agree that three-million rear end accidents occur a year, and only about half those folks fully recover?" Dr. Bhatia responded that he hadn't researched that issue but the statement seemed "extremely out

12

of the usual." Counsel then showed him the pamphlet, which he did not recognize. After a series of questions, it became clear that Dr. Bhatia had never seen the pamphlet before, and to his knowledge it had never been displayed in any of his offices. Defense counsel objected that the pamphlet lacked foundation and the trial court sustained the objection.

The second area related to Dr. Bhatia's outside income disclosures to his employer, UCI. Plaintiff wanted to show Dr. Bhatia was violating UCI's disclosure policy by reporting only a portion of the income he earned as a forensic expert. In this vein, during cross-examination counsel asked Dr. Bhatia to estimate how much he had earned from his expert work in 2016. When Dr. Bhatia answered it was likely somewhere around $200,000, counsel showed him his income disclosure for the 2015-2016 reporting period, which listed outside earnings of 32,700. Dr. Bhatia explained that UCI's reporting requirement applied only to income earned from commitments that directly conflicted with his work at the university, which is why he had reported a lower number. In an attempt to demonstrate Dr. Bhatia's interpretation was wrong, counsel showed him UCI's disclosure policy for the year 2014. During a lengthy series of questions, counsel and Dr. Bhatia went back and forth pointing out the places in the policy that supported their respective interpretations. When counsel tried to read to the jury certain clauses of the policy he believed supported his interpretation, the trial court sustained defendants' hearsay objection.

## 2. *Discussion*

Plaintiff argues the court erred by excluding the whiplash pamphlet because foundation is not required for a prior inconsistent statement. Relying on *Am-Cal Investment Co., Inc. v. Sharlyn Estates, Inc.* (1967) 255 Cal.App.2d 526, 541 and *Jazayeri v. Mao* (2009) 174 Cal.App.4th 301, 316-317 (*Jazayeri*), he argues it was also error to exclude the contents of UCI's reporting policy as hearsay because the policy falls within the "operative facts" exception. We disagree on both points.

Under Evidence Code section 780, "[t]he credibility of a witness may be attacked by showing that, on some former occasion, he made statements 'inconsistent with any part of his [trial] testimony.'" (*People v. Woodberry* (1970) 10 Cal.App.3d 695, 702-703; Evid. Code, § 780, subd. (h).) A trial court has wide latitude in determining whether to admit impeachment evidence, and we review the court's ruling for abuse of discretion. (*People v. Turner* (2017) 13 Cal.App.5th 397, 408.)

Issues of foundation aside, there is a more fundamental reason for excluding the whiplash pamphlet—it isn't a prior inconsistent statement. Plaintiff wanted to use the pamphlet's statement that only about half of the people who experience whiplash will recover to impeach Dr. Bhatia's credibility, but nothing Dr. Bhatia said at trial was inconsistent with the pamphlet's generalized comment on whiplash. Dr. Bhatia gave specific reasons for concluding that plaintiff had not suffered a disc injury but had instead suffered a cervical strain. He never opined about cervical strains in general or how likely people who suffer from a cervical strain are to recover. Additionally, even if the

14

statement were inconsistent with any of Dr. Bhatia's testimony, plaintiff would not be able to demonstrate prejudice. Because the statement is so generalized and contained in a pamphlet Dr. Bhatia claimed to have never seen (let alone endorse), there is simply no likelihood that its exclusion from the case had any effect on the jury's unanimous decision not to compensate plaintiff for the neck surgery.

As for UCI's income reporting policy, plaintiff misunderstands the operative facts exception. As *Jazayeri* explains, the hearsay exception applies when "the very fact in controversy is whether certain things were said or done[,] *not . . . whether these things were true or false*," and the proffered document proves whether those things were in fact said or done. (*Jazayeri*, *supra*, 174 Cal.App.4th at p. 316, quoting 1 Witkin, Cal. Evidence (4th ed. 2000) Hearsay, § 31, p. 714, italics added.) The most common application of this exception is where the parties dispute whether they had reached an agreement, and the court allows the admission of a written contract, which would otherwise be hearsay, as evidence that there had in fact been a meeting of the minds. That is not the situation with the income reporting policy. During cross-examination, counsel and Dr. Bhatia spent a significant amount of time debating the proper interpretation of one particular clause in the policy. By seeking to admit the policy as evidence, plaintiff was trying to demonstrate that his interpretation was correct, not that the policy exists. As such, the court properly excluded the document as hearsay.

15

In any event, plaintiff cannot demonstrate this ruling prejudiced his case, either. Though the policy was not admitted into evidence, counsel covered the relevant policy language at length during cross-examination, at times quoting directly from the document. In addition, plaintiff's counsel also spent a significant portion of his closing statement arguing that his interpretation of the policy was correct, meaning Dr. Bhatia was underreporting the income he received for his forensic expert work. As a result, the jurors had all of the information they needed to infer that Dr. Bhatia was not credible based on his reporting conduct. But such an inference was unlikely on this record, given Dr. Bhatia's credentials and the fact the policy leaves room for his interpretation of the reporting requirement. We therefore conclude there is no likelihood that admitting the policy into evidence would have affected the outcome of the case.

C. *Defendants' Cross-Appeal Is Untimely*

1. *Additional facts*

The trial court entered judgment on August 29, 2018. On September 13, defendants sought a total of $139,951.97 in costs and fees under section 998. They sought $111,774.88 in expert witness fees; the remaining fee request for $28,177.09 covered ordinary litigation costs. While their cost memorandum separated their request into various categories, defendants didn't identify the dates on which any of the costs had been incurred. Plaintiff filed a motion to tax the majority of defendants' costs on the grounds the costs were either incurred pre-offer or unreasonable. Plaintiff attached several invoices from defendants' experts to show the costs had been incurred pre-offer.

In opposing the motion, defendants attached a declaration from their attorney which said he was attaching a "true and correct copy of documents related to Defendant's costs as set forth in [their] Memorandum of costs," but the declaration had no attachments.

On October 29, plaintiff filed a notice of appeal from the judgment. On November 7, the trial court held a hearing on plaintiff's motion to tax costs and granted it in its entirety, taxing $130,667.58 of defendants' costs and awarding them the remaining $9,284.39 The court found defendants' request "deficient" because they failed to identify the dates of the costs. The court also noted that defendants' opposition failed to attach any information regarding the costs or address the costs plaintiff had argued were unreasonable. On December 10, defendants filed a notice of cross-appeal, checking the box marked "other" and saying they were cross-appealing the court's "order taxing costs."

2. *Discussion*

"Section 998 exists to encourage settlement of disputes, where possible, before the parties and the public have incurred the sizeable expense of conducting a full-blown trial. It applies in cases, like this one, where one party has made and the other party has rejected a settlement offer before trial." (*Arave v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (2018) 18 Cal.App.5th 1098, 1116.) The statute provides, "If an offer made by a defendant is not accepted and the plaintiff fails to obtain a more favorable judgment or award, the plaintiff shall not recover his or her postoffer costs and shall pay the defendant's costs from the time of the offer. In addition . . . the court . . . in its discretion,

17

may require the plaintiff to pay a reasonable sum to cover costs of the services of [the defendant's] expert witnesses . . . actually incurred and reasonably necessary." (§ 998, subd. (c).)

In their cross-appeal, defendants challenge the court's order taxing the majority of their section 998 request. They argue the court erroneously failed to treat their attorney's declaration "that all the costs in the Memorandum are true and accurate" as sufficient to satisfy their burden of proving costs and expert fees under section 998. While this argument fails for multiple reasons (the most obvious of which is that defendants have mischaracterized the declaration—it did not say the costs listed in the memorandum were true and accurate, it said it was attaching true and accurate information about the costs, but then failed to do so), we lack jurisdiction to reach the merits of the cross-appeal, because, as plaintiff correctly points out, defendants' challenge is untimely.

Under the California Rules of Court, defendants were required to file their cross-appeal within 20 days of the superior court serving them notice of plaintiff's appeal, which occurred on October 30, 2018. (Cal. Rules of Court, rule 8.108(g).) As we've seen, defendants did not file their notice until December 10, which is 21 days past the cross-appeal deadline. A timely notice of appeal is a jurisdictional requirement we may not overlook. (*Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1316 [in the absence of a valid and timely notice of appeal, the reviewing court lacks jurisdiction].)

18

We note there is an additional jurisdiction issue with defendants' challenge to the cost order. A cross-appeal may challenge only the same judgment or orders challenged by the underlying appeal (*Aheroni v. Maxwell* (1988) 205 Cal.App.3d 284), and it is well established that "[a]n award of expert witness fees [under] section 998 is not incidental to the judgment but is instead a separately litigated issue." (*Fish v. Guevara* (1993) 12 Cal.App.4th 142, 148.) This is because, while section 998 makes ordinary litigation costs mandatory, it gives the trial court discretion to award expert fees. (§ 998, subd. (c).) And, because it is not incidental to the judgment, "a postjudgment award of expert witness fees cannot be reviewed on an appeal [or cross-appeal] from the judgment" but must instead be the subject of a separate notice of appeal. (*Fish*, at p. 148.) In other words, plaintiff's "notice of appeal from the judgment did not create appellate jurisdiction over the trial court's subsequent [ruling on] . . . expert witness fees" such that a cross-appeal would be sufficient to challenge the ruling. (*Ibid.*) Thus, untimeliness aside, defendants' cross-appeal would not give us jurisdiction to review the court's order taxing expert fees— which, at $111,774.88 were the bulk of the costs taxed. To challenge that order, defendants were required to file a separate notice of appeal.

We note there is an additional jurisdiction issue with defendants' challenge to the cost order. A cross-appeal may challenge only the same judgment or orders challenged by the underlying appeal (*Aheroni v. Maxwell* (1988) 205 Cal.App.3d 284), and it is well established that "[a]n award of expert witness fees [under] section 998 is not incidental to the judgment but is instead a separately litigated issue." (*Fish v. Guevara* (1993) 12 Cal.App.4th 142, 148.) This is because, while section 998 makes ordinary litigation costs mandatory, it gives the trial court discretion to award expert fees. (§ 998, subd. (c).) And, because it is not incidental to the judgment, "a postjudgment award of expert witness fees cannot be reviewed on an appeal [or cross-appeal] from the judgment" but must instead be the subject of a separate notice of appeal. (*Fish*, at p. 148.) In other words, plaintiff's "notice of appeal from the judgment did not create appellate jurisdiction over the trial court's subsequent [ruling on] . . . expert witness fees" such that a cross-appeal would be sufficient to challenge the ruling. (*Ibid.*) Thus, untimeliness aside, defendants' cross-appeal would not give us jurisdiction to review the court's order taxing expert fees— which, at $111,774.88 were the bulk of the costs taxed. To challenge that order, defendants were required to file a separate notice of appeal.

## III

## DISPOSITION

We affirm the judgment and dismiss defendants' cross-appeal. In the interests of justice, the parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(5).)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH
J.

We concur:

MILLER
Acting P. J.

FIELDS
J.

21